UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JUSTIN WEKENMANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-1572 |
| | ) | |
| SIMON BIEGASIEWICZ, MATTHEW | ) | |
| NOECKER, and COUNTY OF ERIE, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT AND TO DISMISS**
**(Doc. 47)**

In his two-count Amended Complaint, plaintiff Justin Wekenmann sues Simon
Biegasiewicz, Matthew Noecker, and the County of Erie under 42 U.S.C. § 1983 for alleged
unreasonable seizure and deprivation of liberty without due process and for malicious
prosecution under New York tort law.  (Doc. 22.)  Plaintiff's claims arise out of the events on the
evening of April 2, 2017, when Plaintiff was riding his motorcycle on Heath Road in the Town
of Colden and was involved in a motor vehicle collision with an oncoming vehicle operated by
Matthew Noecker, a detective with the Erie County Sheriff's Office.  Erie County Sheriff's
Deputy Simon Biegasiewicz responded to the scene and ultimately arrested Plaintiff for Driving
While Intoxicated (DWI) and for failure to stay to the right.  Plaintiff was detained, ticketed for
DWI, and subsequently prosecuted for DWI; he was ultimately acquitted of all charges.
(*See* Doc. 22.)

Currently pending is Defendants' Motion for Summary Judgment under Fed. R. Civ. P.
56 and to dismiss under Fed. R. Civ. P. 12(c).  (Doc. 47.)  Plaintiff opposes the motion (Doc. 50)
and Defendants have filed a reply (Doc. 51).  The court elects to rule on the papers.

## **Background**

The facts recited below are undisputed except where noted.  They are drawn from the parties' Rule 56 statements and from the court's own review of the record.  Notably, Plaintiff included with his opposition a transcript of the trial in the 2018 DWI prosecution.  (Doc. 50-3.) To the extent the statements in that transcript are offered to prove the truth of the matter asserted, they are hearsay because the declarants did not make the statements while testifying in this federal proceeding.[1]  Plaintiff's opposition memorandum does not speak to any potential hearsay issues.  But the court considers those issues here because Plaintiff "cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that admissible evidence will be available at trial."  *Burlington Coat Factory Warehouse Corp. v. Espirit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985).  The court addresses the hearsay questions as necessary below.

On Sunday, April 2, 2017, Plaintiff drove his truck from his home in Irving, New York to a garage in Eden, New York, where he put on riding chaps, a jacket, and a helmet, and retrieved his motorcycle.  (Doc. 47-1 at 6, 12, 14.)  Plaintiff and his friend Mike Wasileff[2] made plans the previous day to meet at the Sneakers restaurant and then ride their motorcycles to the Colden Country Inn in Colden, New York.  (*Id.* at 13, 15, 17.)  Plaintiff planned to ride his motorcycle back later that night.  (*Id.* at 15.)  Plaintiff arrived at Sneakers at about 2:30 p.m.  (*Id.* at 16.)  At

---

[1] *See* Fed. R. Evid. 801(c) (defining hearsay as "a statement that: (1) the declarant does not make while testifying *at the current trial or hearing*; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement" (emphasis added)).

[2] The transcript of Mr. Wekenmann's testimony spells Mr. Wasileff's name with one "f," but Mr. Wasileff indicated at the 2018 DWI proceedings that his name is spelled with two fs. (Doc. 50-3 at 105.)  The court can consider that portion of Mr. Wasileff's 2018 testimony either as non-hearsay, *see United States v. Allen*, 960 F.2d 1055, 1069 (D.C. Cir. 1992) (per curiam), or as subject to the exception for personal history under Fed. R. Evid. 803(19).

the restaurant, Plaintiff and Mr. Wasileff watched the first period of the Sabres game. (*Id.*) Plaintiff did not eat any food at Sneakers, but he testified that he consumed one 12 oz. bottle of Michelob Ultra beer. (*Id.*)

After the first period of the hockey game, Plaintiff and Mr. Wasileff rode their motorcycles to the Colden Country Inn, arriving at approximately 3:45 p.m. (*Id.* at 17.) Plaintiff's fiancée Lauren Meyer arrived at the Colden Country Inn at about 4:30 p.m. (*Id.* at 18, 21.) Plaintiff testified that he consumed a 12 oz. bottle of Michelob Ultra beer at about the time that Ms. Meyer arrived. (*Id.* at 19–21.) At Plaintiff's invitation, his friend Dan Brown also stopped by the Colden Country Inn, arriving at around 5:00 p.m. (*Id.* at 17–19.) Plaintiff had a double order of chicken wings for dinner. (*Id.* at 19.) Mr. Brown left his phone at the table when he departed, and Plaintiff offered to bring the phone to Mr. Brown's mother at the nearby Colden Lakes campground on Heath Road. (*Id.* at 18, 20–21.)

Plaintiff left the Colden Country Inn at about 8:30 p.m. to bring Mr. Brown's phone to the Colden Lakes campground. (*Id.* at 20, 25.) He testified that he was familiar with Heath Road because he had visited Mr. Brown there. (*Id.* at 24.) He described it as a narrow, "very curvy," "very dark," and "[v]ery hilly" two-lane road, with no shoulder and no striping. (*Id.* at 22–23.) Plaintiff rode east on Heath Road and delivered the phone to Mr. Brown's mother. (*Id.* at 24–25.) Plaintiff then turned back onto Heath Road headed west. (*Id.* at 25.)

Detective Noecker was driving his department-assigned detective bureau car east on Heath Road that evening. (Doc. 47-4 at 21.) He testified that he was driving at about 45 or 50 mph en route to a report of a fatal overdose. (*Id.* at 14, 16.) He was not wearing a police uniform. (*Id.* at 34.) It was dark out and he had the car's headlights on. (*Id.* at 17.) He saw one headlight coming at him and he could not determine if it was a motorcycle. (*Id.* at 16.) He

testified that when he saw the oncoming vehicle, he said to himself "this guy's going to hit me." (*Id.*) He further testified that he "slowed way down" to about 35 mph and turned the car to the side. (*Id.*)

Plaintiff testified that he shifted from third gear to second gear as he approached the first turn: a blind right-hand turn at the crest of a hill. (Doc. 47-1 at 25–27.) He was traveling at about 35 mph and moved to the inside of the right turn (the side of the lane closest to the right edge of the road). (*See id.* at 26–27.) When he came over the crest of the hill on the turn "there was two headlights coming right at me." (*Id.* at 26.) When he saw the oncoming headlights, he could not tell where in the roadway the headlights were. (Doc. 47-1 at 29.)[3]

Plaintiff described the approaching headlights as moving at "an extreme rate of speed"— greater than 35 mph; he had "very little time to react." (*Id.* at 31.) He testified that he "grabbed the brake, I grabbed the clutch and I hit the rear brake with my foot and I squeezed tight because I didn't know if it was going to be a head-on or side impact or any impact, and I leaned to the inside." (*Id.* at 26.) He saw the oncoming car swerve "[s]lightly to the right to avoid contact." (*Id.* at 31.) Plaintiff further testified that the front left tire of the oncoming car made contact with the motorcycle's left footrest. (*Id.* at 26, 32.) There was also an impact between his left-side

---

[3] Plaintiff testified at the 2018 bench trial on the DWI charge that the oncoming car "was in my lane, 100 percent" and that the oncoming car was "cutting the corner" with the "driver's side of his car . . . half in my lane." (Doc. 50-3 at 130.) That statement—offered here for its truth—is hearsay. The statement does not fit within Federal Rule of Evidence 801(d)(1)(A)'s exclusions because it is not necessarily inconsistent with his 2019 testimony that he could not tell where in the road the oncoming headlights were at the moment he saw them. The statement does not fit within any of Rule 801(d)(1)'s remaining exclusions because it is not offered to rebut any charge of fabrication or improper motive, is not offered to rehabilitate Plaintiff's credibility, and does not identify any person. The Rule 803 exceptions do not apply, nor does Plaintiff assert that he is unavailable as a witness such that Rule 804 might apply. Plaintiff has not argued that his 2018 statement meets the standards for admissibility under the residual exception in Rule 807.

mirror and the driver's side mirror of the oncoming car.  (*Id.* at 34.)  Plaintiff was able to keep the motorcycle upright after the impact; he pulled over to the right side of the road and turned the motorcycle off.  (*Id.*)

Detective Noecker testified that he was driving with the window down and he heard what sounded like an "explosion" as his car made contact with Plaintiff's motorcycle.  (Doc. 47-4 at 17.)  His testimony is that he was traveling at about 35 mph at the moment of impact.  (*Id.* at 16.)  He also observed that the collision caused his driver's side mirror to be "blown off the vehicle."  (*Id.* at 17–18.)  He thought to himself, "I'm going to be turning around looking for somebody who is probably dead."  (*Id.*)  He radioed his dispatcher to send additional units and first aid for a motorcycle accident.  (*Id.* at 18.)  He made a U-turn and started looking for any casualties.  (*See id.* at 20.)  He saw a motorcycle upright on its kickstand and a male walking around in the vicinity of the motorcycle.  (*Id.*)

Plaintiff testified that his friend Mr. Wasileff was riding behind him and that Mr. Wasileff was the first person to arrive at the scene, pulling over in front of Plaintiff.  (Doc. 47-1 at 35.)  While Plaintiff was checking himself for injury and checking his motorcycle for damage, he saw Detective Noecker's car return to the scene "[v]ery quickly."  (*Id.* at 35.)  Detective Noecker testified that he pulled up and stopped within one or two car lengths of the motorcycle that he saw upright at the shoulder of the road.  (Doc. 47-4 at 22, 30–31.)

Detective Noecker activated his car's emergency lights and stepped out of his vehicle.  (*Id.* at 24, 30.)  Plaintiff testified that Detective Noecker's first words were a question addressed to Mr. Wasileff: "Was it you that I hit?"  (Doc. 47-1 at 36.)  Plaintiff testified that he responded, "no . . . you hit me" and that he and Mr. Wasileff approached Detective Noecker, who was standing by the car with the driver's side door open.  (Doc. 47-1 at 36–37.)  Detective Noecker

was uninjured but he testified that he was "partially in shock" and that he was not expecting to

find the rider upright and uninjured. (Doc. 47-4 at 22–23.) He recalled stating to Plaintiff, "no,

you couldn't have hit me," but Plaintiff confirmed "it was me." (*Id.* at 22.)

Plaintiff and Detective Noecker both testified that they spoke with each other at the side

of the road before any other personnel arrived at the scene, but they have somewhat different

accounts of their conversation. Plaintiff testified that:

> He [Detective Noecker] said repeatedly in a frantic [sic], I can't believe that
> just happened. I can't believe that, you know, I hit you. Are you okay? Are you
> okay? I said I am fine. There's no injuries. . . . He just kept asking me over and
> over am I okay. I told him I am fine, you know, just a little shaken up obviously.
> He asked me if there was any damage to the bike, I said there was very minimal
> damage to the bike. And then he said do you need . . . EMS, I said no. And he
> insisted. And then got on his radio on the inside of the car and called the EMS.

(Doc. 47-1 at 37.) Detective Noecker similarly testified that he "verbally asked" Plaintiff

whether Plaintiff was injured and that Detective Noecker called for first aid to evaluate Plaintiff.

(Doc. 47-4 at 31–32.)

According to Detective Noecker's testimony, Plaintiff was "walking around pacing" and

commented: "I'd say I took that corner a little too hot, huh?" (*Id.* at 23.) In his opposing

statement of facts, Plaintiff purports to dispute that he made that comment (Doc. 50-1 ¶ 19), but

Plaintiff does not cite evidence from his own testimony or that of Mr. Wasileff denying that

Plaintiff uttered that comment. Instead, Plaintiff refers to his testimony that he observed

Detective Noecker to be "in a state of complete confusion" (Doc. 47-1 at 37) and suggests that

this "calls into question any accuracy regarding his memory of that conversation." (Doc. 50-1

¶ 19.) The court is not persuaded that Plaintiff has shown a dispute on this point; Plaintiff's

assertion about Detective Noecker's confusion is insufficient.[4]

---

[4] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) ("[T]he plaintiff must
present *affirmative evidence* in order to defeat a properly supported motion for summary

Detective Noecker further testified that in response to the comment about taking the corner "a little too hot," he stated that the important thing was that "you're alive." (Doc. 47-4 at 24.) According to Detective Noecker, Plaintiff noticed the emergency lights on the car and said, "wait a second, you're a cop?" (*Id.*) Detective Noecker confirmed that he was. (*Id.*) Detective Noecker also testified that he made a second call on his radio, advising that the motorcycle rider appeared to be okay. (*Id.* at 23, 31–32.)

According to Detective Noecker, he noticed an odor of alcohol, "specifically beer," on Plaintiff "[r]ight away." (*Id.* at 29, 32.) He elaborated that he noticed the odor "[a]s soon as I started talking to him, once I stepped out of the car. As soon as we were within close proximity and we had talked." (*Id.* at 32–33.) In his opposing statement of facts, Plaintiff purports to dispute that Detective Noecker could smell alcohol on him. (Doc. 50-1 ¶ 21.) In support, he asserts that he had last consumed a 12 oz. beer between 4:30 and 5:00 p.m.—more than three hours before talking with Detective Noecker. (*Id.*) But Plaintiff has supplied no evidence or authority that the odor of alcohol is always undetectable three hours after the last alcoholic beverage was consumed. The court cannot reasonably draw that inference.

Detective Noecker testified that he had two additional exchanges with Plaintiff, although Detective Noecker could not recall whether it was before or after any emergency units arrived at the scene. (Doc. 47-4 at 28–29.) First, Detective Noecker recalled that he asked Plaintiff where Plaintiff was coming from, and Plaintiff replied that he was coming from Colden Lakes. (*Id.* at 29.) In his opposing statement of facts, Plaintiff states that he "cannot confirm or deny that he

---

judgment." (emphasis added)); *Berman v. Parco*, 986 F. Supp. 195, 200 (S.D.N.Y. 1997) ("Simple hope that a jury will not believe the testimony of defendants that has been submitted in support of a summary judgment motion will not defeat the motion where there has been no affirmative evidence submitted to counter the defendants' evidence.").

told Noecker that he was coming from Colden Lakes based on the record" and that "any recollection of Detective Noecker would be faulty due to his state of complete confusion and disbelief because of the accident." (Doc. 50-1 ¶ 20.) The court is not persuaded that Plaintiff has shown a dispute on this point; Plaintiff's assertion about Detective Noecker's confusion is insufficient. *See supra* n.2.

Second—and more significantly—Detective Noecker testified that he asked Plaintiff if Plaintiff had been drinking. (Doc. 47-4 at 29.) According to Detective Noecker, Plaintiff replied that he "had a couple, four or five beers and just shrugged it off." (*Id.*) In his opposing statement of facts, Plaintiff states that he "disputes that he had four or five beers and that Detective Noecker had a conversation with him about alcohol consumption." (Doc. 50-1 ¶ 22.) Plaintiff did testify that he had "the two beers" described above. (Doc. 47-1 at 55.) But, like the analysis above, Plaintiff does not cite evidence from his own testimony or that of anyone else at the scene affirmatively denying the exchange about alcohol consumption between Detective Noecker and Plaintiff. Plaintiff's assertion about Detective Noecker's confusion is insufficient. The fact that Plaintiff does not dispute drinking the two beers described above is also insufficient to establish a material dispute.

It is undisputed that the next people to arrive on the scene were at least two sheriff's deputies and then an ambulance crew. (*See* Doc. 47-1 at 37; Doc. 47-4 at 27.) Plaintiff testified that, like Detective Noecker, the Sheriff's deputies were "very concerned" with Plaintiff's well-being. (Doc. 47-1 at 38.) Another Sheriff's Deputy, Simon Biegasiewicz, was assigned to the Erie County Sheriff's Department crash investigation unit in April 2017. (Doc. 47-5 at 7.) He heard Detective Noecker's radio transmission about a collision with a motorcycle and was

dispatched to the scene at 8:41 p.m.  (*Id.* at 23–24, 26.)  He arrived on the scene at approximately

9:14 p.m., by which time the ambulance was already there.  (*Id.* at 11, 26.)

When asked at his deposition whether he ever informed any of the responding deputies

that he believed Plaintiff was under the influence of alcohol, Detective Noecker testified:

A.    I believe I did, sir.

Q.    And who[m] did you inform?

A.    It was—it would have either been Captain Kaderli or Deputy Biegasiewicz.

Q.    Do you recall—

A.    I don't recall exactly what was said or who was said [sic] or how it was said, but I believe I probably would have said, hey, you might want to take a look at him, he's got a strong odor of alcohol.  I believe that would be something that I probably did say, but I don't recall the specifics or to who it was.

(Doc. 47-4 at 40–41.)  Plaintiff argues that this testimony "is not based on [Detective Noecker's]

recollection, but what he probably would do."  (Doc. 50-1 ¶¶ 21, 47.)  The court rejects that

argument.  The evidence indicates that Detective Noecker lacks a recollection of the precise

words he used or whether he spoke to Captain Kaderli or to Deputy Biegasiewicz.  But Detective

Noecker's testimony is that he did raise the issue of Plaintiff possibly being under the influence

with at least one of the other law enforcement officers at the scene.  Plaintiff has identified no

affirmative evidence to the contrary.

After arriving at the scene, Deputy Biegasiewicz went to the ambulance and stepped

inside.  (*See* Doc. 47-1 at 40–41.)  Plaintiff testified that Deputy Biegasiewicz asked the

ambulance crew if they were done and stated that he needed to talk to Plaintiff.  (*Id.*)  It is

undisputed that Deputy Biegasiewicz spoke with Plaintiff about the accident.  (*See* Doc. 47-5

at 19; Doc. 50-1 ¶ 20.)  Deputy Biegasiewicz testified that he detected "the odor of alcoholic

beverage" while speaking with Plaintiff.  (Doc. 47-5 at 19.)  Plaintiff purports to dispute that

testimony, arguing that by that time more than five hours had elapsed since 4:30 p.m. when
Plaintiff consumed the beer at the Colden Country Inn.  (Doc. 50-1 ¶ 27.)  But the court's
analysis above regarding Detective Noecker's testimony applies equally here.  Plaintiff has
supplied no evidence or authority that the odor of alcohol is always undetectable five hours after
the last alcoholic beverage was consumed.  The court cannot reasonably draw that inference.

    Plaintiff also seeks to undermine Deputy Biegasiewicz's testimony about the odor of
alcohol by pointing to the testimony of the paramedic who assessed Plaintiff in the ambulance.
(*See* Doc. 50-1 ¶¶ 27, 52.)[5]  The paramedic, Jody Feidt, testified at the 2018 DWI trial.
(*See* Doc. 50-3 at 76–104.)  But insofar as they are offered for their truth, Ms. Feidt's statements
in that proceeding that she did not smell alcohol on Plaintiff or find signs of intoxication are
inadmissible hearsay in this case unless an exclusion or exception applies.  Plaintiff has not
identified, and the court cannot discern, any applicable exclusion or exception.  Nor has Plaintiff
shown that admissible evidence on these points will be available at trial.

    Deputy Biegasiewicz testified that he asked Plaintiff about drinking and that Plaintiff
stated that he "had a few beers at the bar."  (Doc. 47-5 at 19.)  Plaintiff testified that he told
Deputy Biegasiewicz or one of the other officers that he had consumed two beers.  (Doc. 47-1
at 54.)  It is undisputed that Deputy Biegasiewicz asked Plaintiff to submit to a Breathalyzer test
and that Plaintiff did not consent to that procedure.  According to Plaintiff, his response to the

---

[5] Defendants argue that ¶ 52 of Plaintiff's opposing statement of facts—regarding Ms.
Feidt's observations—improperly lacks any citation.  (*See* Doc. 51-1 at 7.)  The court agrees that,
in contravention of Local Rule 56(a)(2), ¶ 52 lacks any citation to evidence.  But the court
declines Defendants' invitation to simply "disregard[]" Plaintiff's statement for that reason.
(Doc. 51-1 at 7.)  The court concludes that the appropriate action here is to carefully apply the
rules of evidence and to caution Plaintiff's counsel to adhere to the Local Rules.  *See* Fed. R.
Civ. P. 56(e)(4) (court may issue "any other appropriate order" if a party fails to properly support
an assertion of fact).

Breathalyzer request was: "I don't understand why I would need to take a breathalyzer if you just told me I am not in trouble and I am going home." (*Id.* at 43.)

Plaintiff further testified that Deputy Biegasiewicz asked him if, instead of the Breathalyzer, Plaintiff would consent to "take a few tests to make sure that I was okay to go home." (*Id.* at 43.) It is undisputed that Plaintiff submitted to roadside field sobriety tests administered by Deputy Biegasiewicz. (*See* Doc. 50-1 ¶¶ 29–30.) According to a form that he completed regarding the sobriety tests, Deputy Biegasiewicz rated that Plaintiff passed the leg-stand test but failed the horizontal gaze nystagmus test, the walk-and-turn test, and the finger-to-nose test. (*See* Doc. 47-5 at 17, 41–42.) Plaintiff testified that the test conditions were difficult because he was in a dark area of the road illuminated by bright white lights from the ambulance that were painful to look at. (Doc. 47-1 at 47.) He also asserts that he struggled with the walk-and-turn test because it was on a steep hill and because he was wearing his leather riding gear, including chaps. (*Id.* at 44–45.)

It is undisputed that, after completing the field sobriety tests, Plaintiff submitted to an Alco-Sensor test. (*See* Doc. 47-1 at 48; Doc. 47-5 at 15–16.) Plaintiff testified that Deputy Biegasiewicz refused to show Plaintiff the results of that test. (Doc. 47-1 at 50.)[6] Deputy Biegasiewicz testified that the Alco-Sensor test showed a blood alcohol content of 0.12. (Doc. 47-5 at 16.) It is undisputed that, after the Alco-Sensor test, Deputy Biegasiewicz arrested Plaintiff for driving while intoxicated and for failing to keep right. (Doc. 47-1 at 50–51.) Deputy Biegasiewicz issued Plaintiff two uniform traffic tickets for failing to keep right and for driving while intoxicated. (Doc. 47-5 at 37.) Deputy Biegasiewicz transferred Plaintiff to the

---

[6] Plaintiff seeks to introduce his testimony from the 2018 DWI proceedings that Deputy Biegasiewicz told him that the Alco-Sensor showed a blood alcohol content of .03. (Doc. 50-3 at 146.) Plaintiff offers no basis on which to admit that hearsay.

Colden substation, where Plaintiff was held for 45 minutes before being released.  (Doc. 22

¶¶ 29, 30; Doc. 23 ¶¶ 29, 30.)  The DWI proceedings resulted in dismissal of or acquittal on all

charges.  (Doc. 22 ¶¶ 32; Doc. 23 ¶ 32; *see also* Doc. 18-1.)

Plaintiff asserts that the stated reasons for his arrest were a pretext (*see* Doc. 50-1 ¶ 40);

when asked to identify what conduct suggested that the officers were "out to get [him]" Plaintiff

testified:

> Besides all of the huddling and besides all of the side conversation, I didn't feel
> there was any communication as to what was going on.  Why there was any
> reasoning for what was going on.  I had asked to leave and to go home.  My bike
> was fine to go home.  I was not allowed to leave the scene.  There was no proper
> indication, I guess, of what Officer Biegasiewicz was basing his conclusion on. . . .
>
> It felt to me the situation was concluded that I was—well, not that I was drinking
> and driving, because I was in an accident with another officer.  So, to me, it felt like
> they co-conspired the whole thing at the scene to put me at fault.

(Doc. 47-1 at 54–55.)

## **Legal Standards**

"Summary judgment is warranted only upon a showing that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." *Friend v.*

*Gasparino*, 61 F.4th 77, 84 (2d Cir. 2023) (internal quotation marks omitted); *see also* Fed. R.

Civ. P. 56(a).  "In deciding whether such a showing has been made we 'resolve all ambiguities

and draw all permissible inferences in favor of the party against whom summary judgment is

sought.'"  *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  "The movant 'bears

the initial burden of showing that there is no genuine dispute as to a material fact.'"  *McKinney v.*

*City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114

(2d Cir. 2018)).

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical

to that [for granting] a Rule 12(b)(6) motion for failure to state a claim." *Lynch v. City of New*

*York*, 952 F.3d 67, 75 (2d Cir. 2020) (alteration in original) (quoting *Patel v. Contemp. Classics*, 259 F.3d 123, 126 (2d Cir. 2001)).  In deciding a Rule 12(b)(6) motion, the court accepts as true all of the complaint's "well-pleaded factual allegations." *Id.* at 74–75 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  Taking all such non-conclusory factual allegations as true and construing "all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff," the court determines whether the pleadings "plausibly give rise to an entitlement to relief." *Id.* at 75 (quoting *Iqbal*, 556 U.S. at 679, and *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009) (en banc)).

## Analysis

Defendants argue that Detective Noecker and Deputy Biegasiewicz are entitled to summary judgment on the § 1983 claims and that the § 1983 claim should be dismissed as to the County of Erie (the "County").  Defendants further contend that Detective Noecker and Deputy Biegasiewicz are entitled to summary judgment on the New York malicious-prosecution claims and that the claim against the County should be dismissed.  Finally, Defendants argue that they are entitled to qualified immunity.  (*See* Doc. 47-7 at 2.)  The court begins by addressing the claims against the municipal defendant.

**I.    Claims Against the County of Erie**

**A.    The § 1983 Claim Against the County**

The County of Erie asserts that the § 1983 *Monell* claim[7] against it should be dismissed for three reasons.  First, the County argues that the Amended Complaint fails to plead any official custom or policy as required to establish municipal liability under § 1983.  (Doc. 47-7

---

[7] So named for the Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

13

at 13–14.)  Second, the County notes that the Sheriff of Erie County—not the County itself—was Detective Noecker and Deputy Biegasiewicz's employer at all relevant times.  (*Id.* at 14–15.) Third, the County maintains that there is no evidence of improper supervision or training.  (*Id.* at 15–17.)

In response, Plaintiff argues that it is irrelevant whether the County was Detective Noecker and Deputy Biegasiewicz's employer.  (Doc. 50 at 9.)  As to the County's remaining arguments, Plaintiff asserts that "any challenge to the sufficiency of its Complaint is procedurally inadequate due to a genuine issue of material fact preventing a determination by the Court on a 12(c) challenge to the pleadings.  (*Id.* at 12.)  Plaintiff maintains that he is "entitled to offer support of the County of Erie's knowledge and policies at trial before a legal sufficiency challenge is adjudicated" and that "Defendants failed to raise this challenge at the proper time and now they must wait until all the genuine issues of material fact have been resolved."  (*Id.* at 12.)  Finally, Plaintiff asserts that "whether the County of Erie had knowledge of any prior misconduct by Defendants or there was an improper policy in place is a question for the jury" because "[i]t is not unreasonable for the jury to assume that there is a custom of protecting other detectives and officers at the expense of citizens that the County of Erie had notice of."  (*Id.* at 12–13.)

### 1.    Procedural Issues

The court rejects Plaintiff's argument that the County's Rule 12(c) motion is procedurally improper.  It is true that the defense previously filed a Rule 12(b) motion in this case.  (Doc. 4; *see also* Order on Defs.' Mot. to Dismiss, Doc. 20.)  And Rule 12 includes limitations on successive motions and further states that certain defenses are waived if not raised in a Rule 12(b) motion.  *See* Fed. R. Civ. P. 12(g)(2), 12(h)(1).  But Rule 12(g)(2)'s limitation on further

motions does not apply to Rule 12(c) motions seeking dismissal for failure to state a claim. *See* Fed. R. Civ. P. 12(g)(2) (exception for provisions in Rule 12(h)(2)); Fed. R. Civ. P. 12(h)(2)(B).  The waivers in Rule 12(h)(1) only apply to the defenses listed in Rule 12(b)(2)–(5). *See Ballast v. Workforce7 Inc.*, No. 20-cv-3812, 2024 WL 307966, at *5 (S.D.N.Y. Jan. 25, 2024) ("[F]ailure-to-state-a-claim arguments are not waivable and may be brought in a successive Rule 12 motion.").  Plaintiff appears to recognize that Rule 12(g)(2) and Rule 12(h)(1) are not impediments to the County's Rule 12(c) motion.  (*See* Doc. 50 at 8.)

Instead, Plaintiff argues that courts generally deny Rule 12(c) motions "unless the movant clearly establishes that no material fact remains to be resolved and that he is entitled to judgment as a matter of law."  5C Charles A. Wright et al., Federal Practice and Procedure § 1368 (3d ed.).  According to Plaintiff, there are "genuine issues of fact as to whether an officer under [the] circumstances could reasonably believe probable cause for driving while impaired and failing to keep right existed."  (Doc. 50 at 8.)  The County maintains that the claims on which it seeks dismissal under Rule 12(c) "do not require the Court to consider evidence outside the pleadings."  (Doc. 51-1 at 10.)

Ruling on the defense motion to dismiss the original Complaint in this case, the court determined that the pleading failed to allege a plausible *Monell* claim against the County. (Doc. 20 at 4.)  The court reasoned that there was "no allegation of an express policy permitting false charges against motorists" and "no allegation of deliberate indifference supported by evidence of notice to the county authorities through a history of similar complaints or other facts which would demonstrate that county leadership turned a blind eye to misconduct." (*Id.*)  The court dismissed the *Monell* claim without prejudice and allowed Plaintiff to file an amended complaint "if he has a sufficient factual basis for such a claim."  (*Id.* at 5.)

Notably, the defense did not seek dismissal of the § 1983 claims against the individual officers in that earlier motion. (*See id.* at 3 ("Defendants do not seek dismissal of the § 1983 claim against the individual officers.").) The court was able to reach its conclusion about the plausibility of the *Monell* claim against the County without regard to the asserted factual dispute "as to whether an officer under [the] circumstances could reasonably believe probable cause for driving while impaired and failing to keep right existed." (Doc. 50 at 8.) The court finds no basis for any different conclusion here. The purported factual dispute on which Plaintiff relies is not material to the *Monell* analysis.

The court recognizes that discovery is now complete in this case (*see* Doc. 46) and that a Rule 12(c) motion need not be granted "if evidence that had already been produced during discovery would fill the perceived gaps in the Complaint." *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 325 (2d Cir. 2011). But Plaintiff has not cited any such evidence. That leaves the court with the question of the plausibility of the *Monell* claim based on the allegations in the Amended Complaint.

The operative Amended Complaint includes allegations that the County was on notice of and "turned a blind eye to" Deputy Biegasiewicz's alleged misconduct "due to similar Complaints filed against him in 2015 (Index No. 804822/2015) and 2018 (1:17-cv-01211-LGF)." (Doc. 22 ¶¶ 39–40.) The court can properly consider those two proceedings in the Rule 12 context. *See Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (courts ruling on Rule 12(b)(6) motions may properly review "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, matters of which judicial notice may be taken, as well as documents not expressly incorporated by reference in the complaint that are

nevertheless 'integral' to the complaint" (cleaned up)).  The court considers those allegations
next.

>       **2.       Plausibility of the *Monell* Claims**

As the court previously noted, "Plaintiffs who seek to impose liability on local
governments under § 1983 must prove, inter alia, that the individuals who violated their federal
rights took 'action pursuant to official municipal policy.'"  *Wekenmann v. Erie Cnty. Sheriff's
Off.*, No. 19-cv-1572, 2021 WL 22540, at *2 (W.D.N.Y. Jan. 4, 2021) (quoting *Outlaw v. City of
Hartford*, 884 F.3d 351, 372 (2d Cir. 2018)).  The County contends that the two prior allegedly
similar complaints against Deputy Biegasiewicz do not support a claim of a policy or custom of
constitutional violations.  (Doc. 47-7 at 14.)  The court agrees with the County on this issue.

Deputy Biegasiewicz was a defendant in a case brought in this court alleging malicious
prosecution and § 1983 liability for unreasonable seizure, false arrest, and false imprisonment
arising out of a traffic stop on March 5, 2015.  *Dale v. Biegasiewicz*, No. 17-CV-01211,
2020 WL 6158646, at *1 (W.D.N.Y. Oct. 21, 2020).  The court granted summary judgment to
the defendants, reasoning that probable cause supported the plaintiff's arrest and prosecution and
that probable cause defeated the § 1983 and malicious-prosecution claims.  *Id.* at *5–6.  The
court subsequently denied a Rule 60(b) motion for relief from that summary judgment ruling.
*Dale v. Biegasiewicz*, No. 17-CV-01211, 2021 WL 2187148 (W.D.N.Y. May 28, 2021), *aff'd
sub nom. Dale v. Raczynski*, No. 21-1602, 2022 WL 4479528 (2d Cir. Sept. 27, 2022)
(summary order).

Deputy Biegasiewicz was also a defendant in *Harster v. County of Erie*.  The plaintiff in
that case claimed that, in connection with law enforcement action on January 20, 2014, Deputy
Biegasiewicz used excessive force and was liable for assault, battery, and intentional and

negligent infliction of emotional distress and that the County was liable for negligent hiring, training, and supervision.  Compl., *Harster v. County of Erie*, Index No. 804822/2015 (N.Y. Sup. Ct. Apr. 15, 2015), NYSCEF Doc. No. 1.[8]  The *Harster* complaint also cites 42 U.S.C. § 1983. *See id.* ¶¶ 7, 23.  It appears from the publicly available docket sheet that there has been no action in that case since April 2015.  *See* New York State Unified Court System, https://iapps.courts.state.ny.us/nyscef/DocumentList?docketId=fmSdoS/RlOJBfB7KXYURoQ= =&display=all (last visited Mar. 4, 2024) [https://perma.cc/7RBZ-RB8V].

The court agrees with the County that the *Dale* and *Harster* litigations do not support Plaintiff's *Monell* claim.  Neither case resulted in an adjudication of liability against Deputy Biegasiewicz.  The fact that two complaints were filed is not sufficient to support a plausible *Monell* claim based on the alleged policy of permitting false charges or deliberate indifference to misconduct.  *Cf., e.g., Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) ("Simply put, the fact that there were allegations of thirteen instances of excessive force during arrests over four years (none of which involved findings or admissions of culpability) during which hundreds, if not thousands, of arrests were made does not plausibly demonstrate that the use of excessive force during arrest was so frequent and pervasive to constitute a custom.").  This conclusion makes it unnecessary to reach here the County's alternative argument that it did not employ any of the individual defendants.

### B.   The Malicious-Prosecution Claim Against the County

The County seeks dismissal of the malicious-prosecution claim on three grounds.  First, the County attacks Plaintiff's Notice of Claim (Doc. 22-1), arguing that Plaintiff failed to name the County in that notice.  (Doc. 47-7 at 21–22.)  Second, the County argues that it cannot be

---

[8] A copy of the *Harster* complaint appears in this court's docket at Document 47-3.

liable for malicious prosecution because it did not employ the individual defendants. (*Id.* at 22.)

Third, the County maintains that there was probable cause for the arrest. (*Id.*)  Plaintiff

maintains that: (1) the Notice of Claim properly put the County on notice; (2) whether the

County was the individual defendants' employer is irrelevant; and (3) disputes of fact preclude a

determination as to whether there was probable cause to arrest.  (Doc. 50 at 5, 9, 11.)

### 1.     The Notice of Claim

In a Notice of Claim dated October 30, 2018 and addressed to the Erie County Sheriff's

Office, Simon Biegasiewicz, and Matthew Noecker, Plaintiff gave notice of a malicious

prosecution claim arising out of the events of April 2, 2017.  (Doc. 22-1.)  The County asserts

that New York's notice-of-claim statutes apply to malicious-prosecution claims brought under

New York law and that Plaintiff's malicious-prosecution claim is subject to dismissal because

the Notice of Claim did not name the County of Erie but instead named the "Erie County

Sheriff's Office." (Doc. 47-7 at 21–22.)  In response, Plaintiff argues that N.Y. Gen. Mun. L.

§ 50-e(3)(c) neutralizes the County's attack on the Notice of Claim.  (*See* Doc. 50 at 11–12.)

Plaintiff does not argue that his malicious-prosecution claim is exempt from the notice-

of-claim requirements as a § 1983 claim. *See Garcia v. City of New York*, No. 15 Civ. 7470,

2018 WL 2085335, at *7 (S.D.N.Y. May 3, 2018) (noting that malicious-prosecution claims may

be brought under § 1983 if they rise to the level of a constitutional violation and that "[n]otice of

claim requirements do not apply to claims brought under § 1983." (citing *Felder v. Casey*,

487 U.S. 131, 140 (1988))).  The court therefore assumes, without deciding, that the malicious-

prosecution claim is brought under New York state law.

The court agrees with Plaintiff, however, that if the County's absence as a named entity on the Notice of Claim amounted to a defect in the notice, the provisions of § 50-e(3)(c) overcome that defect.  That statute provides:

> If the notice is served within the period specified by this section, but in a manner not in compliance with the provisions of this subdivision, the service shall be valid if the public corporation against which the claim is made demands that the claimant or any other person interested in the claim be examined in regard to it, or if the notice is actually received by a proper person within the time specified by this section, and the public corporation fail to return the notice, specifying the defect in the manner of service, within thirty days after the notice is received.

N.Y. Gen. Mun. L. § 50-e(3)(c).  Here, Erin Molisani examined Plaintiff at proceedings under N.Y. Gen. Mun. L. § 50-h on behalf of "the various Erie County entities relative to [the] Notice of Claim." (Doc. 47-1 at 6.)  The court therefore concludes that service of the Notice of Claim was valid as against the County under § 50-e(3)(c).  The County has not argued otherwise in its reply memorandum.

### 2.    The Individual Defendants' "Employer"

Citing *DiJoseph v. County of Erie*, No. 18-cv-919, 2020 WL 4194136 (W.D.N.Y. July 21, 2020), the County argues that the Sheriff's Office—not the County—was the individual defendants' employer at all relevant times and that the malicious-prosecution claim therefore cannot proceed against the County.  (*See* Doc. 47-7 at 15, 22.)  Plaintiff maintains that *DiJoseph* is distinguishable and that the County's "non-employer" status is irrelevant to any of the liability determinations in this case.  (Doc. 50 at 9.)  For the reasons below, the court agrees with Plaintiff that the court's analysis here does not depend on whether the County employed the individual defendants.  At the same time, however, the court concludes that the County cannot be liable for any of the alleged conduct in this case.

The Amended Complaint alleges that the County employed Deputy Biegasiewicz and Detective Noecker at all relevant times (Doc. 22 ¶¶ 2–3) and that the County knew of and

"turned a blind eye" to Deputy Biegasiewicz's alleged misconduct in similar prior cases (*id.*

¶¶ 39–40; *see also id.* ¶ 42 (incorporating those allegations into the malicious-prosecution

claim)). Defendants deny each of those allegations, including the "employment characterization

as described." (Doc. 23 ¶¶ 2–3, 39–40, 42.) In his interrogatory responses, Plaintiff explained

the basis for his malicious-prosecution claim against the County and the individual defendants:

> Defendants purposefully, willfully, and negligently subjected Plaintiff to three (3)
> field sobriety tests without probable cause, made false statement[s] of assurance
> to Plaintiff that he would not be arrested, falsified and concealed results of an
> Alco-Sensor Test, and unlawfully arrested Plaintiff with the intent to initiate a
> criminal proceeding against him.

(Doc. 47-2 at 7.) The court has previously dismissed Plaintiff's direct liability claims against the

County based on negligent hiring, training, and supervision. (Doc. 20 at 11.) Plaintiff's

malicious-prosecution claim against the County therefore must be a vicarious-liability claim.[9]

But "[i]t is well established in New York State that a county cannot be held liable under

the doctrine of *respondeat superior* for the actions of its sheriff or sheriff's deputies." *Saleh v.*

*Savage*, No. 12-CV-0468, 2015 WL 1608839, at *7 (W.D.N.Y. Apr. 10, 2015). In *DiJoseph*,

this court adhered to that principle and affirmed that an Erie County local law that indemnifies

employees (including the Sheriff's Department) was not intended "to assume vicarious liability

by that enactment." 2020 WL 4194136, at *8. On this basis—regardless of whether the County

---

[9] This conclusion confirms the court's assumption above that Plaintiff's malicious-prosecution claim is brought under New York state law, not under § 1983, because "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023) (quoting *Monell*, 436 U.S. at 691). The same limitation does not apply to malicious-prosecution claims brought under New York law. *See Anderson v. City of New York*, 817 F. Supp. 2d 77, 98 (E.D.N.Y. 2011) ("[U]nder the common law, 'unlike § 1983, a municipality may be held liable for common law false arrest and malicious prosecution on a theory of *respondeat superior*.'" (quoting *Chimurenga v. City of New York*, 45 F. Supp. 2d 337, 344 (S.D.N.Y. 1999))).

or the Sheriff's Office is the employer of the individual defendants—the court concludes that the County cannot be liable for any of the alleged conduct in this case.

### 3.    Whether there was Probable Cause for the Arrest

"In general, probable cause to arrest exists when 'the historical facts, viewed from the standpoint of an objectively reasonable police officer,' . . . provide knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Rupp v. Buffalo*, 91 F.4th 623, 638–39 (2d Cir. 2024) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Dettelis v. Sharbaugh*, 919 F.3d 161, 164 (2d Cir. 2019) (per curiam) (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)).   The County asserts that the officers had probable cause in this case and that the malicious-prosecution claim should therefore be dismissed.  (Doc. 47-7 at 22.)  The court's conclusion above makes it unnecessary to reach that issue here.  However, the court considers probable cause in the analysis below.

## II.    Claims Against Detective Noecker and Deputy Biegasiewicz

### A.    The § 1983 Claims Against the Officers

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV.  A plaintiff can vindicate that right by bringing a § 1983 false-arrest claim.  *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  But "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest' . . . under § 1983."  *Id.* (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). Defendants argue that probable cause justified the seizure and detention in this case and that they are therefore entitled to summary judgment.  (Doc. 47-7 at 12.)  They also contend that, even if

probable cause was absent in this case, they are entitled to qualified immunity (and summary

judgment) because they had "arguable probable cause." (*Id.* at 23.)

       Although not available to the County, the qualified immunity defense is available to the

individual defendants in this case. *See Askins v. Doe No. 1*, 727 F.3d 248, 254 (2d Cir. 2013)

("Qualified immunity is a defense available only to individuals sued in their individual

capacity.").[10]  "Qualified immunity shields officials performing discretionary functions 'from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Rupp*, 91 F.4th at 642

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "With respect to a claim of arrest

without probable cause, the doctrine shields officers from suit for damages if a reasonable officer

could have believed his action to be lawful, in light of clearly established law and the

information he possessed." *Id.* (cleaned up).  "In addition, qualified immunity is available where

officers of reasonable competence could disagree on whether the probable cause test was met . . .

*i.e.*, where the existence of probable cause for an arrest was at least reasonable and

arguable . . . ." *Id.*; *see also Freeman v. Ellis*, No. 17-cv-683, 2022 WL 2114796, at *4

---

[10] The court recognizes that the doctrine of qualified immunity has recently been the subject of intense public scrutiny and debate, especially as the doctrine relates to police conduct. Courts have also weighed in on the issue. *See, e.g.*, *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421 (2021) (Thomas, J., statement respecting denial of certiorari) ("[O]ur qualified immunity jurisprudence stands on shaky ground."); *McKinney v. City of Middletown*, 49 F.4th 730, 756 (2d Cir. 2022) (Calabresi, J., dissenting) ("[T]he doctrine of qualified immunity—misbegotten and misguided—should go."); *Jamison v. McClendon*, 476 F. Supp. 3d 386, 391–92 (S.D. Miss. 2020) (asserting that qualified immunity "operates like absolute immunity" in real life, and that the doctrine "has served as a shield" for law enforcement officers who have failed to respect "the dignity and worth of black lives"). Still, "[t]his Court is required to apply the law as stated by the Supreme Court." *Jamison*, 476 F. Supp. 3d at 392.

(W.D.N.Y. June 13, 2022) ("[A] false arrest claim will not be successful if a police officer had probable cause or arguable probable cause to make the arrest.").[11]

Plaintiff argues that "Defendants are not entitled to qualified immunity as a matter of law." (Doc. 50 at 7.)  The court agrees that, in some cases, law enforcement officers' entitlement to qualified immunity cannot be decided on summary judgment.  *See, e.g., Russo v. City of Bridgeport*, 479 F.3d 196, 213 (2d Cir. 2007) ("[T]he validity of DePietro's and Boronoa's assertion of qualified immunity cannot be determined at the summary judgment stage.").  But in this case, the court concludes that there is no genuine dispute as to any fact material to the qualified immunity analysis and that Detective Noecker and Deputy Biegasiewicz are entitled to judgment as a matter of law on that basis.

As described above, Plaintiff has failed to show a dispute that he remarked after the collision that he "took the corner a little too hot."  He has also failed to show a dispute that Detective Noecker noticed an odor of alcohol, "specifically beer," on Plaintiff "[r]ight away." (Doc. 47-4 at 29, 32.)  Nor is there any dispute that Plaintiff consumed at least some quantity of beer in the hours before the collision.  Plaintiff also cannot dispute Detective Noecker's testimony that he raised the issue of Plaintiff possibly being under the influence with at least one of the other law enforcement officers at the scene.  And regardless of the results of the field sobriety tests, Plaintiff has introduced no affirmative evidence to counter Deputy Biegasiewicz's testimony that the Alco-Sensor test showed a blood alcohol content of 0.12.

---

[11] Plaintiff cites criticisms of the "arguable probable cause" doctrine.  *See McColley v. County of Rensselaer*, 740 F.3d 817, 831–32 (2d Cir. 2014) (Calabresi, J., concurring) (discussing a "conflict in our cases" relevant to "arguable probable cause").  Some jurists and commentators have likewise expressed reservations.  *See, e.g., Kew v. Town of Northfield*, No. 19-cv-78, 2023 WL 4172741, at *20 n.17 (D. Vt. Apr. 17, 2023).  But the doctrine remains "controlling law in the Second Circuit."  *Id.*

Even without considering the evidence as to whether Plaintiff failed to keep right, the court concludes that Deputy Biegasiewicz's basis for arresting Plaintiff for DWI was at least reasonable and arguable. The undisputed fact that Plaintiff was ultimately acquitted on the DWI charge does not compel a contrary conclusion. *See Hudson v. County of Dutchess*, No. 12-CV-5548, 2015 WL 7288657, at *10 (S.D.N.Y. Nov. 16, 2015) (concluding that the defendants were entitled to qualified immunity due to the presence of arguable probable cause and that "it is irrelevant that Plaintiff ultimately was acquitted of three of the four charges brought against him").

**B.       The Malicious-Prosecution Claims Against the Officers**

Finally, the court considers Detective Noecker and Deputy Biegasiewicz's arguments for summary judgment on the malicious-prosecution claims against them. (*See* Doc. 47-7 at 18.) The individual defendants do not cite any evidence to alter the court's prior conclusion at the Rule 12(b)(6) stage that the statute of limitations is satisfied as to both individual defendants. (Doc. 20 at 9.) However, the individual defendants do assert that they had "ample probable cause to arrest plaintiff." (Doc. 47-7 at 19.)

For the reasons discussed above, the court concludes that, at minimum, arguable probable cause supported Detective Noecker and Deputy Biegasiewicz's actions related to Plaintiff's arrest and prosecution. The individual defendants are therefore entitled to summary judgment on the malicious-prosecution claim. *See Al-Mohammedi v. City of Buffalo*, No. 13-CV-1020, 2016 WL 1748264, at *8 (W.D.N.Y. Mar. 29, 2016) (malicious-prosecution claims failed because officer had arguable probable cause to arrest), *report and recommendation adopted*, 2017 WL 163388 (W.D.N.Y. Jan. 17, 2017). It is therefore unnecessary to address Defendants' remaining arguments for summary judgment on the malicious-prosecution claim.

## <u>Conclusion</u>

Defendants' Motion for Summary Judgment and Motion to Dismiss (Doc. 47) is

GRANTED.

Dated this 29th day of March, 2024.

Geoffrey W. Crawford, Judge
United States District Court